## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| ST. MARY'S REGIONAL MEDICAL CENTER,<br><br>        Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; XAVIER BECERRA, in his official capacity as Secretary of Health and Human Services; HEALTH RESOURCES AND SERVICES ADMINISTRATION; CAROLE JOHNSON, in her official capacity as Administrator of the Health Resources and Services Administration; UNITED STATES DEPARTMENT OF THE TREASURY; and JANET YELLEN, in her official capacity as Secretary of the Treasury,<br><br>        Defendants. | Case No. 2:25-cv-00006-SDN |

## COMPLAINT

Plaintiff St. Mary's Regional Medical Center (St. Mary's) brings this complaint against the United States Department of Health and Human Services (HHS), Xavier Becerra, the Health Resources and Services Administration (HRSA), Carole Johnson, the United States Department of the Treasury (Treasury), and Janet Yellen, and alleges as follows:

### INTRODUCTION

1.      St. Mary's, one of the largest hospitals in Maine, provides essential care to the Lewiston-Auburn community. It features an acute care community hospital, outpatient primary and specialty care, an urgent care and emergency department, and a senior care community with a rehabilitation center. It is also a state-wide resource for behavioral health care. Actions by defendants, however, threaten its ability to fulfill its central mission.

2.      Like virtually all community hospitals, St. Mary's drastically reshuffled its resources to effectively respond to the COVID-19 pandemic and meet the community's health care needs. It provided much needed inpatient and outpatient treatment of COVID-19 patients, established efficient COVID-19 testing for the community, and ultimately administered thousands of COVID-19 vaccinations to community members.

3.      This caused enormous financial strains. Because nearly all elective care ceased, hospital revenues plummeted. Meanwhile, as an essential backstop for care, St. Mary's provided vast amounts of uncompensated care to its community. It did so during trying conditions, to ensure the wellbeing of its patient population.

4.      Recognizing that such hospitals were being fiscally crushed by COVID-19, Congress appropriated billions of dollars to ensure that providers could effectively respond to the pandemic. On March 27, 2020, Congress enacted the Coronavirus, Aid, Relief and Economic Security Act (CARES Act), which appropriated $100 billion "to reimburse … eligible health care providers" for expenses attributable to COVID-19. Pub. L. No. 116-136, 134 Stat. 563 (2020).

5.      Congress imposed two statutory conditions for the funds: (1) they must be used to offset "health care related expenses or lost revenues that are attributable to coronavirus," and (2) they "may not be used to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse." *Id.* Congress twice supplemented these appropriations later in 2020, under the same conditions.[1]

6.      To ensure that the funds were used for these intended purposes, Congress required "recipients of payments" to "submit reports and maintain documentation as the Secretary determines are needed to ensure compliance with conditions that are imposed by this paragraph for such payments." CARES Act, 134 Stat. 563.

---

[1]    Unless otherwise specified in the complaint, the statutes are materially the same. For simplicity, plaintiff cites only to the CARES Act.

7.  HRSA used these funds to create the Provider Relief Fund (PRF), from which it distributed pandemic relief dollars to eligible hospitals. There is no regulatory regime governing the PRF. Rather, HRSA administers the PRF through a vast array of guidance, typically published on its website, that divides the distribution of PRF dollars into phases of distributions. HRSA also established an online portal through which providers submitted reports—during designated timeframes HRSA published on its website—regarding their uses of PRF payments.

8.  In the first three phases of distributions, St. Mary's received seven PRF payments totaling just over $16 million. It timely submitted PRF reports to HRSA demonstrating that it used these payments to reimburse eligible health care expenses and, additionally, that it lost substantially more revenues during the pandemic than the sum of these payments—more than $32 million in 2020 alone—thus establishing that it properly used any future PRF payments it would receive (up to $32 million).

9.  In the fourth phase of distributions, St. Mary's received two PRF payments totaling just over $5.6 million. Because its prior lost revenues greatly exceeded this amount, the payments were properly used to offset lost revenues attributable to COVID-19. Indeed, HRSA does not contend otherwise. All agree that, because St. Mary's had already experienced (and reported) excess net lost revenues substantially greater than this amount in previous reports, it was absolutely entitled to these funds, which Congress specifically intended to alleviate the burdens that institutions like St. Mary's experienced as a result of COVID-19.

10.  Because of a change in personnel causing internal miscommunications, St. Mary's inadvertently failed to timely submit the PRF reports for these two payments through HRSA's system.

11.  St. Mary's discovered this procedural oversight during a yearly audit it conducted to comply with federal law. The audit included a review of St. Mary's substantive and procedural compliance with the PRF terms and conditions. St. Mary's submitted the audit findings to the federal government (in particular, HRSA), notifying the agency that it failed to timely submit these reports but also demonstrating that St. Mary's properly used the funds. HRSA reviewed this audit.

Over the course of a few months following this submission, HRSA and St. Mary's exchanged clarifying communications. HRSA specifically requested—and St. Mary's provided—the new lost revenues "that should [have] be[en] reported" through HRSA's system.

12.     Two days following the culmination of this exchange, HRSA wrote to St. Mary's that the audit findings relating to the untimely PRF reports had been "satisfactorily resolved." St. Mary's thus understood that any potential procedural noncompliance relating to timely submissions of the PRF reports had been addressed.

13.     Months later, however, HRSA announced, without any further warning or communication, that St. Mary's must refund the PRF payments associated with the untimely reports. St. Mary's wrote to HRSA, requesting that it consider all of the prior information St. Mary's had submitted to HRSA establishing that it had properly used the funds. After several months, HRSA finally responded, taking the position that St. Mary's must repay the funds solely because it failed to timely file the reports through HRSA's system—notwithstanding the fact that St. Mary's had conclusively established that it substantively complied with the statutory conditions of use. Because of the time that had passed while St. Mary's was awaiting clarification from HRSA, the government asserts that St. Mary's additionally owes millions of dollars in interest and penalties.

14.     Because of HRSA's debt determination, the Treasury has begun withholding monies owed to St. Mary's for the health care services it provides, including Medicare payments, to offset the purported debt.

15.     This withholding has dire consequences for St. Mary's. As it now stands, St. Mary's has less than 10 days of cash on hand. Because Medicare and Medicare Advantage accounts for roughly half of St. Mary's typical revenue, St. Mary's financial situation is worsening rapidly. The community that St. Mary's serves is at dire risk of losing this critical institution.

16.     HRSA's position violates the statutory text, in addition to defying common sense. Congress intended these funds to reach hospitals that were financially harmed by the COVID-19 pandemic. There is no doubt that St. Mary's qualifies—and that it is entitled to the funds it

received. St. Mary's had already established that it properly used the PRF payments at issue before the applicable reporting window. And, after St. Mary's discovered its failure to timely submit reports, it remediated that procedural error by notifying HRSA of its noncompliance and providing the agency with the substantive information that would have been contained in those reports, even though this information was not necessary to establish its substantive compliance with the statute. In terms of the statutory language, St. Mary's did not need to provide more information "to ensure compliance with conditions" Congress imposed. CARES Act, 134 Stat. 563. Particularly after confirming that St. Mary's resolved any issue from the missed reports—thus triggering reliance interests as St. Mary's built its financial model and budget around these funds—HRSA cannot now change course, demanding repayment.

17. Congress's decision to place substance over form is unsurprising in the context of assisting essential health care providers during a global pandemic emergency. But HRSA's action—which jeopardizes the operations of a provider who properly used Congress's appropriations to supply critical medical services during the pandemic, for no other reason than a procedural technicality—contravenes Congress's purpose and embodies arbitrary and irrational agency action.

18. HRSA's demand for payment is also unlawful because it is arbitrary and capricious. HRSA disregarded that St. Mary's *had* reported—in its previous reports that demonstrated substantial excess lost revenues—the relevant information to establish its "compliance with conditions" Congress imposed on the funds. CARES Act, 134 Stat. 563. And regardless, it remediated its procedural misstep by promptly responding to HRSA's inquiries. HRSA cannot enforce its procedural requirements in a way that is entirely divorced from the substantive purpose that Congress instructed the agency to serve.

19. The agency, moreover, did not comply with its own binding guidance and regulations, both of which are concerned with substantive—not procedural—compliance with PRF payments and both of which would have provided St. Mary's with further process to remedy any procedural noncompliance. And HRSA failed to reasonably explain its decision, which was a

complete reversal of its previous position where it told St. Mary's that it had "satisfactorily resolved" the issues with the PRF reporting. Indeed, in planning its operations, St. Mary's relied on that prior representation.

20.    In sum, HRSA's action is contrary to law and arbitrary and capricious. It must be set aside. And interim relief pending the resolution of this litigation—enjoining the withholding of ongoing federal payments owed to St. Mary's—serves the public interest. St. Mary's needs to receive the Medicare payments it is owed to sustain its operations without disruption. The Lewiston-Auburn community depends on the viability of St. Mary's critical health care services.

**PARTIES**

21.    Plaintiff St. Mary's Regional Medical Center is a 501(c)(3) nonprofit integrated medical system comprised of an acute care community hospital, a professional provider network of specialists and primary care providers, urgent care, an emergency department, and a broad spectrum of behavioral health services. It strives to provide patients with convenient access to high quality, compassionate care throughout Androscoggin County. St. Mary's principal place of business is at 93 Campus Avenue, Lewiston, ME 04240.

22.    Defendant United States Health and Human Services is the agency charged with administering the Public Health and Social Services Emergency Fund (PHSSEF), which Congress appropriated in the CARES Act. HHS created PRF with funds from the PHSSEF. Its principal office is at 200 Independence Ave. SW, Washington, DC 20201.

23.    Defendant Xavier Becerra is the Secretary of the Department of Health and Human Services. He is sued in his official capacity only.

24.    Defendant Health Resources and Services Administration is an agency of the United States government within the Department of Health and Human Services. The Secretary of HHS has delegated to HRSA the authority to administer the PRF.

25.    Defendant Carole Johnson is the Administrator of the Health Resources and Services Administration. She is sued in her official capacity only.

26.    Defendant United States Department of the Treasury is the agency charged with managing federal finances. It administers the Treasury Offset Program, which matches people and businesses who owe debts to the federal government with ongoing federal agency payments, in order to withhold those payments to offset debts. Its principal office is at 1500 Pennsylvania Ave., NW, Washington, DC 20220.

27.    Defendant Janet Yellen is the Secretary of the Treasury. She is sued in her official capacity only.

## JURISDICTION AND VENUE

28.    St. Mary's brings this suit under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

29.    This case arises under the laws of the United States. The court's jurisdiction is thus invoked under 28 U.S.C. § 1331.

30.    Venue is proper in this district under 28 U.S.C. § 1391(e) because the plaintiff resides in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL ALLEGATIONS

### A.    St. Mary's pandemic response in Lewiston

31.    St. Mary's has been a stalwart of the greater Lewiston-Auburn community since it was founded in 1888 by the Sisters of Charity of Saint-Hyacinthe. It provides mission-driven compassionate care through talented caregivers and state-of-the-art medical technology to meet Androscoggin County's community health needs. St. Mary's is comprised of a 233-bed acute care community hospital employing more than 1,000 staff members and providing a number of service lines, including a robust program of behavioral health services, outpatient primary care and specialty providers, urgent care services, an emergency department, and a senior care community with a rehabilitation center.

32.    St. Mary's was a leader in the response to the COVID-19 pandemic in Androscoggin County. It provided essential inpatient and outpatient treatment of COVID-19 patients, offered convenient, safe, and efficient COVID-19 testing and screening, and administered thousands of COVID-19 vaccinations to community members. And it partnered with local organizations to help administer care to some of the most economically challenged communities in the region.

33.    At the onset of the pandemic in the spring of 2020, St. Mary's shifted resources away from preventative and elective care to critical care and COVID-19 screening. St. Mary's established COVID-19 testing tents outdoors and provided COVID-19 screening to thousands of community members when it was most needed. It established an outdoor rapid response emergency department to screen patients for respiratory symptoms. And it took significant measures to ensure staff safety and to mitigate the risk of COVID-19 transmission, including making large purchases of personal-protective equipment, changing entrance procedures and screening, and enforcing visitation limits. This abrupt reshuffling of resources required recruiting additional clinicians to provide critical care to patients and reassigning employees across departments. *See* Lindsay Tice, *As health care shifts, so do health care employees*, Sun Journal (Apr. 7, 2020), perma.cc/MWU6-A8YC.

34.    St. Mary's provided inpatient, critical care treatment to hundreds of patients suffering from COVID-19 throughout the pandemic.

35.    In 2021, St. Mary's organized and administered vaccine clinics, administering thousands of COVID-19 vaccinations to community members.

36.    By reallocating its resources to best meet the health care needs of the community during the pandemic, however, St. Mary's lost substantial revenue compared to pre-pandemic revenues. The decrease in preventative and elective treatments caused St. Mary's revenues to substantially decline—by more than $32 million—in 2020 as compared to 2019.

**B.** **Congress's appropriation of funds to help hospitals like St. Mary's respond to COVID-19 and offset lost revenue attributable to the pandemic**

37.     Congress recognized that the COVID-19 pandemic required significant diversion of health care resources, creating unforeseen expenses and upending traditional revenue streams for health care providers.

38.     To address these challenges and support health care workers' efforts to provide quality patient care during the pandemic, Congress enacted the Coronavirus, Aid, Relief and Economic Security Act (CARES Act) on March 27, 2020, which appropriated $100 billion to the PHSSEF "to reimburse … eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116-136, 134 Stat. 563 (2020).

39.     Congress increased these appropriations one month later through the Paycheck Protection Program and Health Care Enhancement Act (PPPHCEA), Pub. L. No. 116-139, 134 Stat. 622 (Apr. 24, 2020).

40.     Congress wanted its appropriations to be disbursed efficiently, given the rapidly evolving health care response required to mitigate the pandemic. It thus directed the Secretary to promptly review applications on a rolling basis "to provide emergency payment" to eligible providers. CARES Act, 134 Stat. 563. "[E]ligible health care providers" included "public entities, Medicare or Medicaid enrolled suppliers and providers, and such for-profit entities and not-for-profit entities … that provide diagnoses, testing, or care for individuals with possible or actual cases of COVID-19." *Id.*

41.     Congress imposed two key conditions on the funds. *First*, they may only be used to cover "health care related expenses or lost revenues that are attributable to coronavirus." CARES Act, 134 Stat. 563. Illustrating the breadth and flexibility of Congress's intended uses, the statutes clarify in this regard that "funds appropriated under this paragraph … shall be available for," among other things, "building or construction of temporary structures, leasing of properties, medical supplies and equipment including personal protective equipment and testing supplies, increased workforce and trainings, emergency operation centers, retrofitting facilities, and surge

capacity." *Id. Second*, the funds "may not be used to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse." *Id.*

42.     While Congress wanted its appropriations to be disbursed efficiently to provide immediate assistance in the pandemic response, it also wanted to ensure that the funds were used for their intended purposes. To that end, Congress required "recipients of payments" to "submit reports and maintain documentation as the Secretary determines are needed to ensure compliance with conditions that are imposed by this paragraph for such payments." CARES Act, 134 Stat. 563. Congress delegated to the Secretary authority to prescribe the "form," "content," and "tim[ing]" of such reports. CARES Act, 134 Stat. 563.

43.     Congress also required the HHS Office of Inspector General to submit "a final report on audit findings with respect to this program" no later than three years after final payments are made, but it clarified that it did not intend to "limit[] the authority of the Inspector General or the Comptroller General to conduct audits of interim payments at an earlier date." CARES Act, 134 Stat. 563.

44.     HHS created the PRF with these funds. The Secretary delegated authority to HRSA to administer the PRF.

45.     HRSA did not implement the PRF through notice and comment rulemaking. Rather, it published its distribution and payment calculation methodologies, reporting and auditing requirements, and other policies and guidance on the agency's website. These methodologies and policies frequently changed without formal notice to providers.

46.     HRSA distributed the PRF through phases of general distributions and other targeted distributions, using different priorities and methodologies to determine which providers received payments.

47.     Relevant here, HRSA decided that one way providers could calculate lost revenues attributable to coronavirus was by determining the "negative change in year-over-year actual revenue from patient care related sources." HRSA, *General and Targeted Distribution Post-Payment Notice of Reporting Requirements* 4 (Nov. 2, 2020), perma.cc/25SR-MQM2. In other

words, providers could calculate reimbursable lost revenues by showing the decrease in actual revenue for a relevant quarter compared to the same quarter in 2019. *Id.*

48.    Congress increased the appropriations to the PHSSEF through the Consolidated Appropriations Act, 2021 (CAA), Pub. L. No. 116-260, 134 Stat. 1920 (Dec. 27, 2020). In addition to reiterating the same statutory conditions of use and reporting requirements as in the CARES Act and the PPHCEA, this statute incorporated HRSA's guidance for calculating lost revenues due to COVID-19 that could be reimbursed through the PRF, specifying that "for any reimbursement from the Provider Relief Fund to an eligible health care provider for health care related expenses or lost revenues that are attributable to coronavirus (including reimbursements made before the date of the enactment of this Act), such provider may calculate such lost revenues using the Frequently Asked Questions guidance released by [HHS] in June 2020." 134 Stat. 1921.

49.    After the CAA's enactment, HRSA revised its guidance for lost revenue calculations, providing additional options to calculate reimbursable lost revenues. *See* HRSA, *General and Targeted Distribution Post-Payment Notice of Reporting Requirements* (Jan. 15, 2021), perma.cc/FF6Q-48Z6. The agency also clarified that "[i]f recipients do not expend PRF funds in full by the end of calendar year 2020, they will have an additional six months in which to use remaining amounts towards … lost revenues" calculated by comparing 2021 quarter revenues to either the comparable 2019 or 2020 quarter revenues. *Id.* at 2.

50.    By 2022, HRSA extended this practice and methodology for the remainder of the COVID-19 Public Health Emergency. *See* HRSA, *How to Calculate Lost Revenues for PRF and ARP Rural Reporting* (Oct. 31, 2022), perma.cc/YZP5-ZKPG. Any PRF payments a provider received "may be applied to patient care lost revenues up to the end of the quarter in which the Public Health Emergency ends."

51.    The Public Health Emergency ended on May 11, 2023. HRSA permitted using PRF payments to offset lost revenues through June 30, 2023. HRSA, *Post-Payment Notice of Reporting Requirements* (Apr. 24, 2024), perma.cc/957L-WRR9.

11

52.    Accordingly, in 2020, 2021, 2022, and the first half of 2023, providers could calculate lost revenues attributable to COVID-19 by comparing the difference between actual quarterly revenue for a particular quarter to the same quarter in 2019. And any PRF payments a provider received could properly be used to offset these lost revenues, up to a year following receipt for a payment. For example, a PRF payment received in December 2021 could be used to offset lost revenues between January 2020 and December 2022. *See* HRSA, *Post-Payment Notice of Reporting Requirements* (Apr. 24, 2024), at 2 (Table 1), perma.cc/957L-WRR9.

| Period | Payment Received Period | Period of Availability for Lost Revenues |
|--------|------------------------|------------------------------------------|
| 1 | April 10, 2020, to June 30, 2020 | January 1, 2020, to June 30, 2021 |
| 2 | July 1, 2020, to December 31, 2020 | January 1, 2020, to December 31, 2021 |
| 3 | January 1, 2021, to June 30, 2021 | January 1, 2020, to June 30, 2022 |
| 4 | July 1, 2021, to December 31, 2021 | January 1, 2020, to December 31, 2022 |
| 5 | January 1, 2022, to June 30, 2022 | January 1, 2020, to June 30, 2023 |
| 6 | July 1, 2022, to December 31, 2022 | January 1, 2020, to June 30, 2023 |
| 7 | January 1, 2023, to June 30, 2023 | January 1, 2020, to June 30, 2023 |

53.    HRSA created a "PRF Reporting System" for recipients receiving more than $10,000 in PRF payments to report their uses of the funds. Among other things, the system contained data fields where providers would report the PRF payments they received and retained in a period, other federal assistance received, unreimbursed expenses attributable to coronavirus, and actual revenues, beginning in 2019, to demonstrate lost revenues.

54.    HRSA required recipients to submit a report through the agency's system within a three-month period beginning one year after the end of the payment-received period. For example, for PRF payments received between July 1, 2021, and December 31, 2021, HRSA required recipients to submit a report through its system between January 1, 2023, and March 31, 2023. *See* HRSA, *Post-Payment Notice of Reporting Requirements* (Apr. 24, 2024), at 3 (Table 3), perma.cc/957L-WRR9.

| Period | Payment Received Period | Reporting Time Period |
|---|---|---|
| 1 | April 10, 2020, to June 30, 2020 | July 1, 2021, to September 30, 2021 |
| 2 | July 1, 2020, to December 31, 2020 | January 1, 2022, to March 31, 2022 |
| 3 | January 1, 2021, to June 30, 2021 | July 1, 2022, to September 30, 2022 |
| 4 | July 1, 2021, to December 31, 2021 | January 1, 2023, to March 31, 2023 |
| 5 | January 1, 2022, to June 30, 2022 | July 1, 2023, to September 30, 2023 |
| 6 | July 1, 2022, to December 31, 2022 | January 1, 2024, to March 31, 2024 |
| 7 | January 1, 2023, to June 30, 2023 | July 1, 2024, to September 30, 2024 |

**C.    St. Mary's use of PRF funds to serve the community during the pandemic**

55.    St. Mary's used its first seven PRF payments to reimburse expenses attributable to coronavirus. These funds were essential in enabling St. Mary's ability to continually provide COVID-19 screening, testing, treatment, and vaccination to the community without interruption.

56.    St. Mary's received seven PRF payments between April 10, 2020, and August 27, 2020, totaling more than $16 million. Exhibit I, HRSA December 18, 2024, Letter at 1 n.1.

57.    St. Mary's timely submitted its PRF reports for all seven of these payments through HRSA's PRF Reporting System. In these reports, in addition to documented its unreimbursed expenses attributable to coronavirus, St. Mary's also provided HRSA with actual revenues demonstrating that its lost revenues for 2020 exceeded $32 million. Thus, even after accounting for its first seven PRF payments, St. Mary's had reported a large lost revenue balance that would automatically be applied to any future PRF payments.

58.    Relevant here, St. Mary's received two more PRF payments totaling $5,666,481.62 in "period 4": (1) a $2,441,104.66 payment on November 23, 2021; and (2) a $3,225,376.96 payment on December 16, 2021. Although St. Mary's sustained additional lost revenues in 2021 and 2022, its substantial lost revenues from 2020 alone—which it had already reported to HRSA— substantively established that these PRF payments were properly used to offset COVID-19 lost revenues according to the statutory conditions. *See supra* ¶ 52, (HRSA table providing that "period 4" PRF payments could be used to offset lost revenues between January 1, 2020 and December 31, 2022).

### D.    St. Mary's audit and corrected reporting of two payments

59.    Separate from the PRF program, providers that expend $750,000 or more in aggregated federal financial assistance (including PRF payments) are subject to Single Audit requirements. *See* 45 C.F.R. § 75.501. "A Single Audit allows one audit to cover the audit requirements for multiple Federal awards." HHS Office of Inspector General, *Single Audits* (last accessed January 1, 2025), perma.cc/4P3K-U37K.

60.    St. Mary's received more than this amount in federal financial assistance, so it was subject to Single Audit requirements.

61.    To satisfy these requirements, St. Mary's contracted with a third-party auditing service to conduct an audit for 2021 and 2022 and submit findings to HRSA.

62.    Although the Single Audit requirement was distinct from any PRF requirements, HRSA made clear that "PRF report[s] [are] to be tested as part of providers' independent audits." HRSA, *Audit Requirements*, perma.cc/7CCS-FPHZ.

63.    The audit report thus reviewed "all Period 3 and 4 funds received between January 1, 2021 and December 31, 2021 and expended by December 31, 2022 as reported to [HRSA] via the Provider Relief Fund Reporting Portal," which included the $5.6 million PRF payments St. Mary's received in "period 4."

64.    During the course of this audit—in the fall of 2023—St. Mary's learned that it had inadvertently failed to submit the PRF reports for the two relevant "period 4" payments.

65.    Per HRSA's website guidance, the reports for these payments had to be submitted through the PRF Reporting System between January 1, 2023, and March 31, 2023. Consistent with that guidance, in January 2023, HRSA had mailed a letter to St. Mary's then-Chief Financial Officer, Donald Bevers, instructing him to file these reports by March 31, 2023.

66.    Donald Bevers left employment at St. Mary's in early April 2023, creating a temporary vacancy in the CFO position.

67.    Unbeknownst to St. Mary's at the time, Bevers had not filed the requisite reports for the two period 4 PRF payments before he left employment.

68.     By the time the CFO position was filled—and St. Mary's later understood that it had inadvertently failed to timely submit the period 4 PRF reports—the PRF Reporting System had closed for that period, and it was impossible for St. Mary's to submit them electronically through the System.

69.     St. Mary's 2022 Single Audit Report made two findings concerning internal controls over the accuracy and timeliness of its PRF reporting.

70.     St. Mary's submitted its 2022 Single Audit Report to HRSA. The agency's Division of Financial Integrity reviewed the report and "concurred with [the] findings." *See* Exhibit G, HRSA March 20, 2024 Letter at 1.

71.     HRSA then initiated direct communications with St. Mary's as part of its "Provider Relief Audit Resolution process … to resolve the finding[s]" in the Single Audit Report. Exhibit C, HRSA October 18, 2023, E-mail.

72.     On October 19, 2023, St. Mary's provided HRSA with its updated policies that addressed the findings identified in the Single Audit Report. Exhibit C, HRSA October 19, 2023, E-mail.

73.     HRSA responded to this email on January 24, 2024, requesting the actual lost revenues related to the findings in the Single Audit Report. Exhibit D, Lost Revenues Emails.

74.     St. Mary's responded on February 4, 2024, providing the actual lost revenues for Q3 and Q4 of 2022, which were $2,609,936 and $10,212,994, respectively. Again, these lost revenues were not necessary to establish the proper use of the PRF payments, given the substantial lost revenues from 2020. Exhibit D, Lost Revenues Emails.

75.     On February 5, 2024, St. Mary's received two Final Repayment Notices in the mail from HRSA. The Notices stated that St. Mary's was "not in compliance with the statutory authority or the Terms and Conditions of the PRF program" because it "ha[d] not reported on the uses of the [period 4] funds." Exhibits E-F, HRSA, *Final Repayment Notices* 1 (Feb. 2, 2024). HRSA demanded that St. Mary's "return the payments within 60 days of this letter" or else "a federal debt and associated collection action may be determined." *Id.* The Notices also provided, however, that

St. Mary's could "request to review this information regarding your receipt of PRF payment, your failure to report on the uses of the funds, or your failure to return funds" by providing HRSA with "an explanation and supporting documentation." *Id.* at 2.

76.     Because St. Mary's was already in direct communications with HRSA regarding the period 4 PRF reports, St. Mary's provided this information in a follow-up email on February 22, 2024, explaining that it had not timely submitted the period 4 PRF reports due to the CFO vacancy.

77.     HRSA responded on March 14, 2024, stating that because St. Mary's "failed to submit [the period 4 PRF reports]," it had "additional questions about lost revenues." Exhibit D, Lost Revenues Emails. It sought to confirm the total amount of St. Mary's lost revenue in 2022 and the "amounts in PRF payments" received that year. *Id.* In other words, HRSA requested the additional "lost revenues that should [have been] reported." *Id.*

78.     St. Mary's responded to HRSA on March 18, 2024, explaining that it had sustained more than $14 million in additional lost revenue in 2022, and that it further expended $743,851 on PRF-eligible uses in Q3 2022 (after the relevant "period 4"). Exhibit D, Lost Revenues Emails.

79.     By this point, St. Mary's had provided HRSA—in direct back-and-forth communications concerning the missed period 4 PRF reports—all of the substantive information that it would have otherwise reported through the System and that the agency needed to understand that St. Mary's had properly used the PRF payments to offset its substantial lost revenues attributable to COVID-19.

80.     Two days later, HRSA sent St. Mary's a letter stating that the Single Audit's "two findings relating to the … Provider Relief Fund (PRF) Program" had "been satisfactorily resolved" "[u]pon review of the findings and your organization's responses." Exhibit G, HRSA March 20, 2024, Letter at 1.

81.     St. Mary's reasonably understood this letter to mean that no further corrective action was needed with respect to the missed period 4 PRF reports, as this letter followed direct communications with HRSA concerning what would have been the substantive content of those

reports. St. Mary's thus relied on this agency action for planning its future cash flow needs. Had it not received this letter, it would have minimized capital expenditures and closed certain services sooner to shore up its cash flow.

82.    Indeed, HRSA did not otherwise respond to St. Mary's last clarifying email concerning its lost revenues as it related to the missed PRF reports.

**E.    HRSA's determination that St. Mary's must return all PRF funds associated with the untimely PRF reports**

83.    On July 29, 2024, notwithstanding the apparent resolution of the PRF report issue, HRSA "determined debts against" St. Mary's and "referred the debts to the Program Support Center (PSC), a U.S. Department of Health and Human Services Operating Division that performs debt collection." Exhibit I, HRSA December 18, 2024, Letter at 2.

84.    In August 2024, St. Mary's received a letter from the United States Department of Treasury's Centralized Receivables Service (CRS) stating that HRSA was recouping the two period 4 payments, and that interest would accrue at 11.875% and a 6% penalty would apply for failure to pay within 91 days.

85.    Perplexed by this invoice, St. Mary's promptly initiated communications with HRSA and the Department of Treasury to seek clarification. It reasonably believed the invoice may have been the product of a bureaucratic miscommunication.

86.    St. Mary's submitted a dispute to CRS on or about August 30, 2024, which HRSA denied shortly thereafter.

87.    On September 26, 2024, St. Mary's wrote to HRSA and the Department of Treasury to "respectfully request that HRSA and CRS cease current collection efforts and allow St. Mary's to submit any outstanding reports with respect to the PRF funds to the HRSA portal," which it had been unable to do since it discovered its oversight. Exhibit H, St. Mary's Sept. 26, 2024, Letter at 2. St. Mary's reiterated that, although "due to an internal error [it] did not timely submit reporting," it discovered this oversight during its Single Audit and "promptly addressed the[se] findings" with HRSA. *Id.* at 1.

88.    In its letter, St. Mary's explained in detail how it "appropriately used the PRF funds it received for eligible expenses and lost revenues," and that it had already "submitted [this information] to HRSA in response to the Audit." Exhibit H, St. Mary's Sept. 26, 2024, Letter at 1-2. Because St. Mary's had "complied with all information requests" following the Single Audit, and because on March 20, 2024, HRSA stated that the issues "have been satisfactorily resolved," St. Mary's "reasonably believe[d] that no further action was necessary in connection with the PRF funds." *Id.* at 2.

89.    St. Mary's also explained that HRSA's recoupment of appropriately used PRF payments was unlawful because such action was not authorized by the CARES Act and subsequent appropriations statutes. The agency's actions "violate not only the letter of the law but also the spirit and purpose of the PRF program" by "jeopardizing the financial stability of the very providers that Congress intended to help." St. Mary's Sept. 26, 2024, Letter at 3.

90.    After sending this letter, St. Mary's communicated with HRSA nearly every week from October through December 2024 in an effort to resolve the matter. On two occasions beginning in November, HRSA indicated that it would imminently be sending St. Mary's a responsive letter.

91.    By November 21, 2024, CRS stated that the two purported debts had grown substantially due to interest and penalties. The total balance was nearly $8 million.

92.    Beginning in mid-December, the Department of Treasury began withholding federal monies owed to St. Mary's for medical care it provided to offset the purported debt.

93.    As long as this matter remains unresolved, the Treasury will continue to take possession of federal funds otherwise due to St. Mary's, including Medicare payments and other congressionally directed funds, through the Treasury Offset Program.

94.    On December 18, 2024, HRSA wrote to St. Mary's that because it "did not submit the required reports for [the period 4] payments," St. Mary's "is required to repay the funds." Exhibit I, HRSA December 18, 2024, Letter at 1. HRSA explained that because St. Mary's "neither repaid the funds nor submitted Decision Review requests by the 60-day deadline" as stated in the

Final Repayment Notices, the agency "determined debts against" St. Mary's and "referred the debts" for collection on July 29, 2024. *Id.* at 2.

95.    HRSA further stated that, "[o]nce a payment has been referred … for collection activities, there are no additional actions that the debtor can take with HRSA to remediate this debt," and that "[a]t this juncture, the debt is with the Department of Treasury." Exhibit I, HRSA December 18, 2024, Letter at 2.

96.    As to St. Mary's explanation that it thought this matter had already been resolved, HRSA stated that St. Mary's "is incorrect" because "the audit finding was a procedural finding, rather than a monetary finding." Exhibit I, HRSA December 18, 2024, Letter at 3.

97.    HRSA did not acknowledge the direct communications between the agency and St. Mary's, in which St. Mary's directly provided HRSA—upon the agency's requests—the relevant lost revenues it would have reported. Nor did HRSA acknowledge that St. Mary's previously submitted reports had already established that St. Mary's properly used the "period 4" PRF payments to partially offset excess lost revenues from 2020. HRSA turned a blind eye to this context and simply stated that St. Mary's "was aware of the requirement to report on its uses of funds, as it had done seven times prior." Exhibit I, HRSA December 18, 2024, Letter at 3.

### HRSA'S DETERMINATION THAT ST. MARY'S MUST REPAY PRF FUNDS IS UNLAWFUL AND SHOULD BE SET ASIDE.

#### A.    HRSA's determination is final agency action reviewable under the APA.

98.    The APA provides that "final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704.

99.    As a general matter, two conditions must be satisfied for agency action to be "final," and thus subject to challenge under the APA. *Bennett v. Spear*, 520 U.S. 154, 177 (1997). "First, the action must mark the 'consummation' of the agency's decisionmaking process" and must not be "of a merely tentative or interlocutory nature." *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) (quoting *Bennett*, 520 U.S. at 177-178)). "And second, the action must be

one by which 'rights or obligations have been determined' or from which 'legal consequences will flow.'" *Id.*

100.    Both criteria are satisfied here. HRSA's determination that St. Mary's must repay the PRF payments is neither tentative nor interlocutory. In its December 18, 2024, letter, HRSA stated that because St. Mary's "neither repaid the funds nor submitted Decision Review requests by the 60-day deadline" HRSA imposed in its Final Repayment Notice, it "determined debts against [St. Mary's]" and "referred the debts" to the agency "that performs debt collection, on July 29, 2024." HRSA December 18, 2024, Letter at 2. This action determines the rights and obligations of St. Mary's. Indeed, the Department of the Treasury has begun withholding Medicare payments otherwise owed to St. Mary's to offset HRSA's debt determination. Legal consequences are thus flowing directly from HRSA's action. *See Bennett*, 520 U.S. at 178.

101.    St. Mary's has no adequate alternative to review under the APA. HRSA's last communication with St. Mary's made clear that the agency had already "determined debts against [St. Mary's]" and "referred the debts to the Program Support Center (PSC)," which performs debt collection. Exhibit I, HRSA December 18, 2024, Letter at 2. HRSA foreclosed the potential of any further agency process, stating that "[o]nce a payment has been referred to PSC for collection activities, there are no additional actions that the debtor can take with HRSA to remediate this debt." *Id.*

102.    APA review is still available even though St. Mary's did not previously seek intra-agency review of HRSA's action.

103.    HRSA established a voluntary process, which it terms "Decision Review," by which providers could dispute HRSA's Final Repayment Notices. *See* HRSA, *Decision Review* (last accessed Dec. 31, 2024), perma.cc/6ZLE-YDUK ("Providers that would like to dispute HRSA's request for repayment can request a Decision Review via the Decision Review Portal.").

104.    St. Mary's did not seek Decision Review because—after receiving the Final Repayment Notices and directly responding to HRSA's inquiries requesting the relevant additional lost revenues associated with the missed reports—the agency told St. Mary's that the audit findings

concerning the missed PRF payments "ha[d] been satisfactorily resolved." Exhibit G, HRSA March 20, 2024, Letter at 1. St. Mary's reasonably understood it had established to HRSA's "satisfact[ion]" that it need not repay the funds, and thus there was no need for it to seek Decision Review. *Id.*

105.    In any event, St. Mary's was not required to exhaust its claim before HRSA prior to bringing this litigation. The Supreme Court has held that for APA claims, courts must abide by Congress's express exhaustion terms in the statute, which "limit … exhaustion of administrative remedies to that which the [underlying] statute or rule clearly mandates." *Darby v. Cisneros*, 509 U.S. 137, 146 (1993); *see* 5 U.S.C. § 704 ("agency action otherwise final is final … unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority."). In light of this statutory text, the Supreme Court held that "it would be inconsistent with the plain language … for courts to require litigants to exhaust optional appeals as well." *Id.* at 147.

106.    HRSA's Decision Review was optional; it was a creature of HRSA's design, not one of statute or regulation. Because there is no statutory or regulatory requirement that mandates exhaustion here, St. Mary's was not required to seek Decision Review before seeking relief under the APA.

107.    Even if administrative exhaustion were somehow generally required here, two exceptions would apply. First, it would have been futile for St. Mary's to seek Decision Review given that it had already submitted all the relevant information to HRSA. Courts have long recognized an "exception[] to the exhaustion requirement … where the effort to proceed formally with … administrative remedies would be wholly futile." *Glover v. St. Louis-San Francisco Ry. Co.*, 393 U.S. 324, 330 (1969). St. Mary's already provided HRSA with all the information the agency needs to determine that the PRF payments were properly used according to their statutory conditions. "Given the steps that [St. Mary's] took and the relief that they received, further invocation of the administrative process … [is] not required." *Doucette v. Georgetown Public Schs.*, 936 F.3d 16, 32 (1st Cir. 2019). Second, "it was the agency not the plaintiff[] that prevented

administrative remedies from being exhausted." *Ezratty v. Com. of Puerto Rico*, 648 F.2d 770, 775 (1st Cir. 1981). St. Mary's would have requested Decision Review had HRSA not informed St. Mary's that the issue was "satisfactorily resolved." Exhibit G, HRSA March 20, 2024, Letter at 1.

**B.    HRSA's action is contrary to the statute's plain text and Congress's purpose.**

108.    Congress did not authorize HRSA to recoup PRF payments that an eligible provider properly expended consistent with the statutory conditions—as St. Mary's did—simply because the provider failed to timely submit a report through HRSA's PRF Reporting System.

109.    Congress imposed two substantive conditions on the funds. *First*, the statutes provide that the PRF payments must be used for "health care related expenses or lost revenues that are attributable to coronavirus." CARES Act, 134 Stat. 563. *Second*, the statutes specify that the funds "may not be used to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse." *Id.*; *see also Hospital for Special Surgery v. Becerra*, 2023 WL 5448017, at *6 (D.D.C. 2023) (describing these statutory "guardrails" and "constraints on the use of the appropriated funds").

110.    St. Mary's complied with those conditions, and it provided the necessary information to HRSA for the agency to determine its compliance. In fact, the previous PRF reports St. Mary's had submitted already established excess lost revenues that could be applied to justify the proper use of the PRF payments at issue.

111.    HRSA does not dispute that St. Mary's properly used the funds according to these statutory conditions.

112.    The statutes provide that "recipients of [PRF] payments … shall submit reports and maintain documentation as the Secretary determines are *needed to ensure compliance with conditions that are imposed by this paragraph for such payments*." CARES Act, 134 Stat. 563 (emphasis added).

113.    Although the statutes require recipients to report their uses of PRF payments, by the statutes' express terms, the procedural step of filing a report is not itself a "condition[] … for

[PRF] payments." CARES Act, 134 Stat. 563. Rather, the reports are a tool for HRSA "to ensure compliance with" the substantive "conditions imposed by" the statutes. *Id.*

114.    The statutes thus authorize the Secretary "to ensure compliance with conditions that are imposed [by the statutes] for such payments," and Congress required recipients to submit reports to the Secretary to facilitate this task. CARES Act, 134 Stat. 563. And to the extent Congress delegated authority to the Secretary to decide the "form," "content" and "tim[ing]" of such reports, it was limited to facilitating "such purpose"—that is, ensuring the PRF payments were properly used. CARES Act, 134 Stat. 563 (providing that "such reports and documentation shall be in such form, with such content, and in such time as the Secretary may prescribe *for such purpose*" (emphasis added)).

115.    Congress thus did not condition PRF payments on the mere procedural act of timely submitting these reports as the Secretary may prescribe. Nor did it delegate authority for the Secretary to himself create such a condition. This choice is wholly unsurprising, given that Congress was undoubtedly more concerned with substance over form in the middle of a once-in-a-century global pandemic emergency.

116.    Of course, if a recipient never reported its uses of PRF payments, then HRSA would be unable to determine whether the recipient "compli[ed] with [the] conditions imposed" on such funds. In that circumstance, HRSA would be within its statutory authority to recoup the payment.

117.    But that is not what happened here: St. Mary's notified HRSA that it inadvertently missed the reporting deadline, had already demonstrated that it properly used the funds in previous reports, provided the additional information it failed to report, and answered direct follow-up questions posed by the agency in back-and-forth communications concerning the PRF payments at issue.

118.    This statutory construction is "the best reading of the statute." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2266 (2024). It is the only reading that ensures "effect is given to all its provisions." *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). HRSA's contrary interpretation would supplant the text

limiting the purpose of the reports to providing the agency with information "needed to ensure compliance with conditions that are imposed by this paragraph for such payments." CARES Act, 134 Stat. 563. It would also supplant the text limiting the boundaries of the Secretary's authority to develop reporting requirements to those which facilitate "such purpose"—that is, ensuring compliance with the substantive limitations of the funds' uses. *Id.*

119.    Not only is this the best reading of the statutory text, but it also is consistent with Congress's plain purpose in enacting the CARES Act. Congress was principally concerned with "respond[ing] to coronavirus" and ensuring that health care providers would have the resources necessary to do so effectively. CARES Act, 134 Stat. 563. It would defy Congress's purpose to later jeopardize the operations of these same providers who properly used the funds to supply critical medical services during the COVID-19 pandemic, for no other reason than missing a reporting window.

120.    Because HRSA's action is not authorized by the statute, it is contrary to law and must be set aside. 5 U.S.C. § 706(2)(A), (C).

**C.    HRSA's action is arbitrary and capricious.**

121.    HRSA's action is also arbitrary and capricious for multiple reasons.

122.    *First*, St. Mary's had in fact already reported to HRSA *before* the reporting deadline at issue all of the information the agency needed to establish that St. Mary's had properly used the PRF payments. No further reports were "needed to ensure [St. Mary's] compliance with [the statutory] conditions." CARES Act, 134 Stat. 563.

123.    In its previously submitted reports, St. Mary's had reported actual lost revenues in 2020 exceeding $32 million. *See* Exhibit A, St. Mary's Period 1 PRF Report at 5; Exhibit B, St. Mary's Period 2 PRF Report, at 7.

124.    These reports also made clear that, because St. Mary's justified its first seven payments using unreimbursed expenses attributable to coronavirus, there were "$0.00" in "PRF remaining to be applied to [these] Lost Revenues." Exhibit B, St. Mary's Period 2 PRF Report, at

24

7; *see also* Exhibit A, St. Mary's Period 1 PRF Report, at 6 ("Other PRF Remaining for Possible Lost Revenues Reimbursement: $0.00").

125.    By the time St. Mary's would have submitted the relevant PRF reports at issue (which concerned just over $5 million in PRF payments), it had nearly $32 million in lost revenues from 2020 that had not yet been offset by PRF payments.

126.    Based on HRSA's methodology, these excess lost revenues would automatically be applied to justify any future PRF payments, regardless of St. Mary's revenues in subsequent years.

127.    HRSA's recoupment of St. Mary's PRF payments simply because St. Mary's failed in a given timeframe to resubmit the same information it already provided the agency is the epitome of an arbitrary and capricious action. The agency not only based its action on a "minor technicality" that put "form over substance" (*Aroostook Med. Ctr. v. Leavitt*, 365 F. Supp. 2d 51, 57 n.14 (D. Me. 2005)), but it also more generally failed to "examine the relevant data" St. Mary's had already submitted *before* the reporting deadline (*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

128.    *Second*, HRSA's determination that St. Mary's must refund the period 4 PRF payments despite providing the agency with the requisite information to determine St. Mary's substantively complied with the statutory conditions of use is contrary to HRSA's own published policies.

129.    Throughout HRSA's published guidances, it consistently takes a position—in accord with the best reading of the statute—that if the agency has questions or concerns about a recipient's PRF reporting or lack thereof, it will provide the recipient with an opportunity to demonstrate its substantive compliance with the conditions of use. *See, e.g.*, HRSA, *Audit Requirements*, perma.cc/7CCS-FPHZ ("HRSA will give providers an opportunity to demonstrate the allowability of costs (for example, through submission of additional supporting documentation)."). That is precisely what happened here, yet HRSA nonetheless determined it would recoup St. Mary's PRF payments for a procedural misstep.

130.    Under the *Accardi* doctrine, an agency must "follow [its] own rules." *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003) (referencing *United States ex. rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954)); *see also Nat'l Env't Dev. Ass'n Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic … that an agency is bound by its own regulations."). A party may challenge "an agency's failure to abide by its own regulations . . . [and] such claims may arise under the APA." *Damus v. Nielsen*, 313 F. Supp. 3d 317, 337 (D.D.C. 2018).

131.    This principle applies not just to codified regulations but also to published agency guidance that affects citizens' rights. "[A]n agency pronouncement is transformed into a binding norm if so intended by the agency, a determination that takes into account the substance and intent of the agency action, as well as whether it confers individual protections or privileges." *Damus*, 313 F. Supp. 3d at 336 (quotations omitted); *see Vitarelli v. Seaton*, 359 U.S. 535, 539-40 (1959) (holding that the enforceability of agency policies depends on whether they impose binding norms on the agency); *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 224 (D.D.C. 2020) ("Rules that fall within *Accardi*'s ambit include internal agency guidance that are intended to be binding norms" (alterations adopted and citation omitted)).

132.    "HRSA is responsible for reviewing audit reports submitted" in accordance with the Single Audit requirement, and its guidance makes clear that the "objectives" of auditing the PRF payments in the Single Audit is—consistent with the best reading of the statute—to "[c]onfirm that funds were used for healthcare-related expenses and lost revenues attributable to coronavirus" and that these "expenses or lost revenues reimbursed by PRF were not reimbursed or obligated to be reimbursed from other sources." HRSA, *Audit Requirements*, perma.cc/7CCS-FPHZ.

133.    HRSA's audit guidance thus states it may make procedural and/or monetary findings in an audit report. For procedural findings—like failing to timely file a PRF report— "HRSA will evaluate providers' Corrective Action Plans (CAP) to ensure providers adequately address the findings." HRSA, *Audit Requirements*, perma.cc/7CCS-FPHZ. For monetary findings, "HRSA will give providers an opportunity to demonstrate the allowability of costs (for example,

through submission of additional supporting documentation).” *Id.* And “[q]uestioned costs that cannot be substantiated … will be disallowed by HRSA.” In that event, “HRSA will issue a Management Decision Letter (MDL) providing the basis for disallowing the costs and specifying the total amount deemed unallowable.” *Id.*

134.    The audit guidance thus distinguishes between procedural and monetary findings in two important respects: (1) only monetary findings may result in the need to “repay[]” the award; and (2) in the event of monetary findings, HRSA provides specified procedures for challenging, reviewing, and explaining the accuracy of such findings. HRSA, *Audit Requirements*, perma.cc/7CCS-FPHZ.

135.    HRSA did not follow its own audit guidance in St. Mary’s case. The agency states that it only made “a procedural finding, rather than a monetary finding” concerning the missed PRF reports (which it deemed that St. Mary’s had “satisfactorily resolved”), yet it nonetheless determined that St. Mary’s must “repay[]” the award. Exhibit I, HRSA December 18, 2024, Letter at 3. And despite the guidance’s specified due process protections for such monetary determinations, St. Mary’s received none.

136.    HRSA also flouted its own regulation that it relies upon to recoup St. Mary’s PRF payments. Under 45 C.F.R. § 75.371, which sets forth “[r]emedies for noncompliance” with “the terms and conditions of a Federal award,” the agency is supposed to first “impose additional conditions” to remedy the noncompliance; only if HRSA “determines that noncompliance cannot be remedied by imposing additional conditions,” can it then take further action, such as “[t]emporarily withhold cash payments pending correction of the deficiency,” or “[w]holly or partly suspend … or terminate the Federal award.”

137.    HRSA did not comply with this regulation. Although St. Mary’s remedied the noncompliance with HRSA’s reporting condition by supplying the agency with the requested information, HRSA made no attempt to “impose additional conditions,” “[t]emporarily withhold cash payments pending correction of the deficiency,” or apply any other lesser remedy. 45 C.F.R.

§ 75.371. Instead, it categorically terminated the award and determined St. Mary's must pay back the entire amount over its procedural stumble.

138.    HRSA's repeated failures to comply with its own rules runs afoul of the *Accardi* doctrine and renders its debt determination arbitrary and capricious.

139.    *Third*, HRSA's action is arbitrary and capricious because its decision "is not reasonably explained." *Antilles Consolidated Educ. Ass'n v. Fed. Labor Relations Auth.*, 977 F.3d 10, 15 (D.C. Cir. 2020). An agency must base its actions "on a consideration of the relevant factors" and "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

140.    Incredibly, HRSA's explanation does not even acknowledge the context preceding its debt determination. The agency entirely disregards that (1) St. Mary's discovered it missed the period 4 PRF reports during its Single Audit; (2) St. Mary's shared that finding with HRSA and offered an explanation for why it inadvertently failed to timely submit the reports; (3) St. Mary's previously submitted PRF reports already established substantial lost revenues that would carry over into the missed reports and more than covers the PRF payments at issue; (4) HRSA directly asked St. Mary's for the substance of the missed PRF reports; (5) St. Mary's promptly responded to those requests; and (6) the information St. Mary's provided to HRSA established that it expended all of its PRF payments properly.

141.    HRSA instead blinds itself to these "relevant factors," transmogrifying a procedural oversight into a substantive noncompliance of the terms and conditions worthy of full repayment. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. That is not "reasoned decisionmaking." *Id.* at 52.

142.    HRSA also "chang[ed] its course" without "supply[ing] a reasoned analysis." *State Farm*, 463 U.S. at 42.

143.    Two days after the culmination of extensive back-and-forth communications with St. Mary's concerning its missed PRF reports and the "lost revenues that should [have been] reported," HRSA wrote to St. Mary's that the audit's "findings relating to the … Provider Relief

Fund (PRF) Program" had "been satisfactorily resolved" "[u]pon review of the findings and your organization's responses." Exhibit G, HRSA March 20, 2024, Letter at 1.

144.    St. Mary's reasonably relied on the agency's position in concluding that it need not take further action to remedy its inadvertent untimely reporting.

145.    Without further warning or notification, HRSA months later flip-flopped its position and referred the entire amount of the PRF payments associated with the delayed reporting to the Department of Treasury for collection. HRSA provided no reason for its changed position when it made the debt determination.

146.    "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). Yet that is precisely what HRSA did here: it completely reversed course in the most extreme manner, disregarding its binding guidance and regulations in the process. That is textbook arbitrary and capricious action.

**D.    HRSA's unlawful action jeopardizes St. Mary's operations, and it is in the public interest to preserve the status quo.**

147.    HRSA's unforeseen recoupment of the PRF payments, which has instigated the Treasury to continuously withhold federal payments to St. Mary's for the medical services it provides, threatens St. Mary's ongoing ability to serve the community.

148.    St. Mary's continues to experience serious financial challenges that are already affecting the low-income families and seniors in the region. It has operated at a significant loss—losing millions—in every year since the pandemic began. HRSA's action twists the knife in the wound and risks St. Mary's financial ability to keep its doors open.

149.    In December 2024, St. Mary's announced that would close its intensive care unit by the end of the year due to financial challenges.

150.    Nearly half of St. Mary's revenue comes from Medicare patients. The Treasury's present withholding of Medicare payments is devastating St. Mary's cash flow. In December 2024,

St. Mary's had approximately ten days of cash on hand. If the Treasury continues to garnish the remaining alleged debt through March 2025, this cash on hand would likely be virtually depleted unless St. Mary's makes drastic changes to operations.

151.    Thus, if HRSA's action is allowed to stand, St. Mary's will likely have to further reduce its services, which would cause irreparable harm to St. Mary's and be disastrous for the Lewiston-Auburn community.

152.    An interim stay of HRSA's debt determination and the Treasury's enforcement that depends on it best serves the public interest. St. Mary's appropriately used the funds Congress appropriated in the CARES Act. It runs directly contrary to Congress's purpose to risk the ongoing viability of St. Mary's operations pending the outcome of this litigation, when Congress provided St. Mary's with these funds so it could withstand the financial effects of the pandemic without compromising excellence in patient care.

**CLAIMS FOR RELIEF**

**Count I**
**Administrative Procedure Act:**
**Agency action contrary to law**

153.    Plaintiff incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

154.    The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction [or] authority" or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (C).

155.    "[I]t is 'axiomatic' that 'administrative agencies may act only pursuant to authority delegated to them by Congress.'" *Air All. Houston v. EPA*, 906 F.3d 1049, 1060 (D.C. Cir. 2018) (quoting *Clean Air Council v. Pruitt*, 862 F.3d 1, 9 (D.C. Cir. 2017)). Agency action that contravenes the statute must be set aside.

156.    Congress did not authorize HRSA to recoup PRF payments that undisputedly were used in accordance with the statutory conditions solely on the basis of a recipient's good-faith procedural lapse in submitting a timely PRF report.

157.    HRSA's recoupment of PRF payments solely on the basis of St. Mary's untimely "period 4" PRF reports—notwithstanding St. Mary's demonstration that it substantively complied with the statutory conditions of the payments—is not authorized by the statutes. It runs directly contrary to the statutory text and Congress's manifest intent. *See* CARES Act, 134 Stat. 563.

158.    Because HRSA acted contrary to the statutory text, its action was in excess of statutory authority and must be set aside. *See, e.g.*, *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 609 (2013).

## Count II
### Administrative Procedure Act:
### Arbitrary and capricious agency action

159.    Plaintiff incorporates and re-alleges the foregoing paragraphs as though fully set forth herein.

160.    The APA authorizes courts to set aside agency action that is arbitrary and capricious. 5 U.S.C. § 706(2).

161.    HRSA's action is arbitrary and capricious because St. Mary's previously submitted reports demonstrating substantial lost revenues that would offset all of its future PRF payments. St. Mary's had thus already reported before the reporting deadline everything the agency needed to substantively establish it properly used the PRF payments at issue.

162.    HRSA also "fail[ed] to abide by its own regulations," which amounts to an "unlawful action under the APA." *Damus*, 313 F. Supp. 3d at 337. It did not comply with its audit guidance or the regulation upon which it bases its recoupment, both of which would have provided St. Mary's with further process to remedy its purported noncompliance with HRSA's terms and conditions.

163.    HRSA did not supply a reasoned explanation for its decision. It entirely disregarded the relevant context preceding its action, where St. Mary's directly communicated to HRSA its substantive compliance with the PRF statutory conditions of use in response to HRSA's targeted inquiries. Indeed, even before the reporting period, St. Mary's had supplied information to HRSA—showing its prior losses—that entitled it to these funds. And HRSA provided no explanation for its complete reversal in position, which St. Mary's had reasonably relied upon, demanding full repayment months after the agency stated that St. Mary's had "satisfactorily resolved" the audit's findings relating to the missed PRF reports. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020) (holding that it is "arbitrary and capricious" for an agency "to ignore" a party's "serious reliance interests" "[w]hen the agency changes course").

164.    For all of these reasons, HRSA's action is arbitrary and capricious and must be set aside. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff St. Mary's respectfully requests that the Court enter judgment in its favor and that the Court:

(a.)    Declare that HRSA's determination that St. Mary's must repay any PRF payments is contrary to law and arbitrary and capricious;

(b.)    Set aside HRSA's debt determination;

(c.)    Issue an interim stay of HRSA's debt determination and Treasury's withholding of federal payments pursuant to 5 U.S.C. § 705;

(d.)    Award Plaintiff attorney's fees and costs; and

(e.)    Award Plaintiff such other and further relief as the Court may deem just and proper.

Dated: January 10, 2025

Respectfully submitted,

/s/ *Melissa A. Hewey*
Melissa A. Hewey
David M. Kallin
DRUMMOND WOODSUM & MACMAHON
84 Marginal Way, Suite 600
Portland, ME 04101-2480
(207) 772-1941
mhewey@dwmlaw.com

Paul W. Hughes (*pro hac vice* to be filed)
Sarah P. Hogarth (*pro hac vice* to be filed)
Mary H. Schnoor (*pro hac vice* to be filed)
Alex C. Boota (*pro hac vice* to be filed)
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street NW
Washington, DC 20001
(202) 756-8000
phughes@mwe.com

*Attorneys for Plaintiff*
*St. Mary's Regional Medical Center*